Brent H. Blakely (SBN 157292)
bblakely@blakelylawgroup.com
Victoria E. Mulvey (SBN 343220)
vmulvey@blakelylawgroup.com
BLAKELY LAW GROUP
1108 Manhattan Ave., Suite B
Manhattan Beach, California 90266
Telephone: (310) 546-7400
Facsimile: (310) 546-7401

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTEE LAUDER, INC., a Delaware Corporation; LE LABO HOLDING LLC, a Delaware Limited Liability Company; LA MER TECHNOLOGY, INC., a Delaware Corporation; CLINIQUE LABORATORIES, LLC, a Delaware Limited Liability Company; AVEDA CORPORATION, a Delaware Corporation; and 001 DEL LLC d/b/a TOM FORD, a Delaware Limited Liability Company, <br><br> Plaintiffs, <br><br> vs. <br><br> WALMART, INC., a Delaware Corporation; WAL-MART.COM USA, LLC, a California Limited Liability Company; and DOES 1-10, inclusive, <br><br> Defendants. | CASE NO.: 2:26-cv-01341 <br><br> **COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF** <br><br> **1. TRADEMARK INFRINGEMENT (CLAIMS 1-6)** <br><br> **2. FALSE DESIGNATION OF ORIGIN AND FALSE DESCRIPTIONS (CLAIMS 7-12)** <br><br> **3. TRADE DRESS INFRINGEMENT UNDER THE LANHAM ACT (CLAIM 13)** <br><br> **4. COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION (CLAIM 14)** <br><br> **5. VICARIOUS TRADEMARK INFRINGEMENT (CLAIM 15)** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Estée Lauder, Inc. ("Estée Lauder"), Le Labo Holding LLC ("Le Labo"), La Mer Technology, Inc ("La Mer"), Clinique Laboratories, LLC ("Clinique"), Aveda Corporation ("Aveda"), and 001 Del LLC d/b/a Tom Ford ("Tom Ford") (collectively, "Plaintiffs," or the "ELC Brands") for their claims against defendants Walmart, Inc. ("Walmart") and Wal-mart.com USA LLC ("Walmart.com") and DOES 1-10 (collectively, "Defendants") allege as follows:

**JURISDICTION AND VENUE**

1.     Plaintiffs file this action against Defendants for trademark infringement and false designation of origin under the Lanham Trademark Act of 1946, 15 U.S.C. § 1051 et seq. (the "Lanham Act"), and related claims of trademark infringement and unfair competition under the common law of the State of California.

2.     This Court has subject matter jurisdiction over Plaintiffs' Lanham Act claims under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338(a), and supplemental jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. § 1367(a) because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

3.     This Court has personal jurisdiction over Defendants because Defendants committed an intentional act by offering for sale and/or selling products which infringe upon Plaintiffs' intellectual property as more fully described below, such actions were expressly aimed at the state of California and its consumers, partly because Defendants operate an interactive website where the infringing products can be purchased from and shipped to this State, and advertise and market such products to consumers in this State, and thus Defendants caused monetary and reputational harm to Plaintiffs that Defendants know is likely to be suffered in this District because Defendants know that Plaintiffs conduct substantial business in the State of California.

4.     Venue is proper under 28 U.S.C. §§ 1391 (b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district, most of the evidence is located in this judicial district, and Defendants are subject to personal jurisdiction in this District.

**THE PARTIES**

5.     Estée Lauder, Inc. is a corporation organized and existing under the laws of the state of Delaware, with an office and principal place of business located at 767 Fifth Avenue, New York, New York 10153.

6.    Le Labo Holding, LLC is a limited liability company organized and existing under the laws of the state of Delaware, with an office and principal place of business located at 233 Elizabeth Street, New York, New York 10012.

7.    La Mer Technology, Inc. is a corporation organized and existing under the laws of the state of Delaware, with an office and principal place of business located at 767 Fifth Avenue, New York, New York 10153.

8.    Clinique Laboratories, Inc. is a corporation organized and existing under the laws of the state of Delaware, with an office and a principal place of business located at 767 Fifth Avenue, New York, New York 10153.

9.    Aveda Corporation is a corporation organized and existing under the laws of the state of Delaware, with an office and principal place of business located at 4000 Pheasant Ridge Drive, Minneapolis, Minnesota 55449.

10.    001 Del LLC d/b/a Tom Ford is a limited liability company organized and existing under the laws of the state of Delaware, with an office and principal place of business located at 767 Fifth Avenue, New York, New York 19153.

11.    Upon information and belief, Walmart, Inc. is a corporation organized and existing under the laws of the state of Delaware and is registered to do business in the state of New York, with an office and principal place of business located at 702 South West 8th Street, Bentonville, Arkansas, 72716.  Furthermore, Plaintiffs are informed and believes that Walmart eCommerce, a business division within Walmart responsible for overseeing Walmart's online retail operations and www.walmart.com, is primarily located at 850 Cherry Ave., San Bruno, CA, 94066.

12.    Upon information and belief, Wal-Mart.com USA, LLC has its primary office located at 850 Cherry Ave, San Bruno, CA 94066.

13.    Upon information and belief, Walmart and/or Walmart.com own, operate, and/or control the Walmart website at www.walmart.com (the "Walmart Website").

14.    Plaintiffs are unaware of the names and true capacities of Defendants, whether individuals, corporate and/or partnership entities, named herein as DOES 1

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

through 10, inclusive, and therefore sues them by their fictitious names. Plaintiffs will seek leave to amend this complaint when their true names and capacities are ascertained. Upon information and belief, each one of Defendants caused or are in some manner responsible for causing the wrongful acts alleged herein, and that at all relevant times each one was the agent, servant, and/or employee of the other Defendants acting within the course and scope of said agency, service, and employment.

15.    Upon information and belief, at all relevant times herein, each one of Defendants knew or reasonably should have known of the wrongful acts and behavior alleged herein and the damages caused thereby, ratified and encouraged such acts and behavior, and/or had a non-delegable duty to prevent such acts and behavior but failed or refused to do so.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**A.    The Estée Lauder Companies Brands, Marks, and Trade Dress**

16.    The Estée Lauder Companies, Inc. ("ELC") is a global leader in prestige beauty. With a portfolio of over 20 best-in-class brands, including ESTÉE LAUDER ®, CLINIQUE®, LA MER®, LE LABO® and TOM FORD® (the "ELC Brands"), ELC designs, manufactures, markets, and sells high-quality skin care, makeup, fragrance, and hair care products and serves as a steward of consumer-beloved luxury and prestige brands globally.

**1. The ESTÉE LAUDER ® Brand**

17.    Estée Lauder Inc. owns, manages, enforces, licenses and maintains the intellectual property, including trademarks and copyrights, used in connection with the operation of the ESTÉE LAUDER brand (hereinafter referred to as "Estée Lauder"). Founded in 1946 by Mrs. Estée Lauder, one of the world's first female entrepreneurs, the Estée Lauder brand continues her legacy of creating innovative, sophisticated, high-performance skin care and makeup products and iconic fragrances. One of the largest cosmetic brands in the world, Estée Lauder continues to be at the forefront of the beauty

industry, engaging consumers in over 150 countries and territories around the world and at a variety of touchpoints, in stores and online.

18.    With over 40 years of expertise in night science and over 30 years of collagen research, Estée Lauder is known for its advanced skincare solutions, including anti-aging products and treatments that cater to a broad range of skin types and concerns.

19.    Over the last 70 years, Estée Lauder has produced some of the most iconic skincare and make-up products, such as the Advanced Night Repair Synchronized Recovery Complex, Re-Nutriv Ultimate Lift Age-Correcting Creme and Pure Color.

20.    Estée Lauder is the owner of numerous marks, including, in relevant part, the following U.S. Trademark Registrations ("Estée Lauder Marks"):

**[Intentionally Left Blank]**

| Estée Lauder Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| ESTÉE LAUDER | 3217192 | March 13, 2007 | IC 003- (Cosmetics, toilet preparations & perfumery products, namely lipsticks, lip gloss, lip liners, lip balms, lip palettes; eye shadows, eye lining pencils, liquid eye liners, eye makeup, mascara, eyebrow pencils, eye palettes, blushers, multi-use cosmetic sticks, foundation makeup, pressed powder, loose powder, makeup remover, concealers, multi-use-colored creams, powders & gels for use on face, cleansers, namely, facial cleansers & skin cleansers; exfoliators, namely, skin & facial exfoliators; moisturizers for the face & body, masks for the face & body, toners, eye |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

| Estée Lauder Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| | | | creams, skin cleansing wipes; non-medicated skin care creams, lotions, oils, sprays, & gels for the face & body; body firming creams, lotions, serums, & sprays for the face & body; nail polish, nail enamel; fragrances for personal use; suncare lotions, bronzers, tanning lotions, sunscreens, after sun soothers & rehydrators, namely, sun creams, lotions & gels) |
| ADVANCED NIGHT REPAIR | 3126881 | Aug. 08, 2006 | IC 003- (Non-medicated skincare preparations) |

| Estée Lauder Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
|  | 6166738 | October 06, 2020 | IC 003- (Non-medicated skincare preparations) |

21.    Attached hereto as **Exhibit A** are true and correct copies of the trademark registrations identified in paragraph 20 of this Complaint, which are incorporated herein by reference.

### 2.  The LE LABO® Brand

22.    Le Labo Holding LLC owns, manages, enforces, licenses and maintains the intellectual property, including trademarks and copyrights, used in connection with the operation of the LE LABO® brand (hereinafter referred to as "Le Labo"). Le Labo was founded in the Nolita neighborhood of New York City in 2006 with creativity and craftsmanship in mind. Le Labo distinguishes itself in the fragrance world by using a "slow perfumery" approach—emphasizing the importance of hand-blending and assembling its fragrances and offering customized labels to customers.

23.    Since its start in 2006, the popularity of Le Labo's fragrances has steadily grown in the U.S. and around the world. Le Labo's fragrances have been and remain highly coveted today by consumers as one of the most popular and recognizable symbols of luxury.

24.    Le Labo's products are the subject of significant media attention and are often singled out by industry editors.  For example, Le Labo's fragrances were highlighted by Harpers' Bazaar this year, including the wildly popular SANTAL 33.

Le Labo also regularly collaborates with prominent third parties in the field of culture, art, hospitality and fashion. For example, in 2010, Le Labo created its fragrance CADE 26 for the famous Gramercy Park Hotel in New York City, and more recently collaborated with The Met and launched a co-branded LAURIER 62 candle inspired by a Henri-Edmond Cross Painting. Since then, the popularity of Le Labo products has grown exponentially, with celebrities such as Taylor Swift, Joe Jonas, Sophie Turner, and Gracie Abrams among a myriad of others reportedly wearing its fragrances. Beyoncé was shown burning two Le Labo candles in her 2016 visual album *Lemonade*.

25.    The worldwide recognition as a luxury brand and the overwhelming popularity of its products is due to Le Labo's continuous commitment to quality and excellence. Today, Le Labo is widely available and sold to consumers in every state, including California, through its website www.lelabofragrances.com, free-standing Le Labo stores, and luxury department stores such as Saks Fifth Avenue, Bloomingdales, and Nordstrom, both online and at their brick and mortar locations. Le Labo products are sold in more than 70 countries in more than 600 retail locations globally.

26.    Le Labo is the owner of numerous marks, including, in relevant part, the following U.S. federal trademark registrations (collectively, the "Le Labo Marks"):

| Le Labo Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| LE LABO | 4659463 | Dec. 23, 2014 | IC 003- (perfumes, aftershaves, and colognes); IC 004 (scented candles) |

| Le Labo Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| LE LABO | 4659715 | Dec. 23, 2014 | IC 003- (fragrances, hair care preparations, non-medicated skin care preparations, non medicated bath care preparations, non-medicated bath care preparations, scented room sprays, soaps and detergents); IC 35 (online retail store services featuring fragrances, perfumes, aftershaves, and colognes, non-medicated skin care preparations, non-medicated bath care preparations, hair care preparations, candles, soaps and detergents, and scented room sprays; Retail store services featuring fragrances, perfumes, aftershaves, and colognes, non-medicated skin care preparations, non-medicated bath care preparations, hair care preparations, candles, soaps and detergents, and scented room sprays) |

| Le Labo Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| **LE LABO** GRASSE — NEW YORK | 7303674 | Feb. 13, 2024 | IC 003- (fragrances, hair care preparations, non medicated skin case preparations, non medicated toiletry preparations); IC 004 (candles); IC 35 (online retail store services featuring fragrances, perfumes, aftershaves, and colognes, non-medicated skin care preparations, non-medicated bath care preparations, hair care preparations, candles, soaps and detergents, and scented room sprays; Retail store services featuring fragrances, perfumes, aftershaves, and colognes, non-medicated skin care preparations, non-medicated bath care preparations, hair care preparations, candles, soaps and detergents, and scented room sprays) |
| SANTAL 33 | 6806693 | Aug. 02, 2022 | IC 003- (Fragrances; Laundry detergent; Non-medicated skin care preparations; Non-medicated toiletry preparations) |

27.    Attached hereto as **Exhibit B** are true and correct copies of the trademark registrations identified in paragraph 26 of this Complaint, which are incorporated herein by reference.

### 3. The LA MER® Brand

28.    La Mer Technology, Inc. owns, manages, enforces, licenses and maintains the intellectual property, including trademarks and copyrights, used in connection with the operation of the LA MER brand (hereinafter referred to as "La Mer"). La Mer started when aerospace physicist Dr. Max Huber suffered burns in a lab accident and was inspired to create his own skin care products. After 12 years of experimentation, he discovered a fermentation process that transformed sea kelp and other ingredients into La Mer's first product: the CREME DE LA MER® moisturizing cream, which has been sold at department stores in the United States since 1956.

29.    ELC acquired La Mer (or its predecessor in interest) in 1995 and, since then, La Mer has become one of the most coveted skincare brands in the world. For example, many A-List celebrities have been reported to use La Mer skincare products, and La Mer's "The Eye Concentrate" eye cream won *Allure* Magazine's Best of Beauty award in 2023. La Mer products have also been mentioned countless times in famous publications such as *Harper's Bazaar* and *Marie Claire*.

30.    The worldwide recognition as a luxury brand and the overwhelming popularity of its products is due to La Mer's continuous commitment to quality and excellence. La Mer is sold nationwide through its website www.cremedelamer.com, in addition to luxury department stores such as Saks Fifth Avenue and Nordstrom, and specialty beauty retailers such as Sephora and Bluemercury, both online and at their brick and mortar locations.

31.    La Mer is the owner of numerous marks, including, in relevant part, the following U.S. federal trademark registrations (collectively, the "La Mer Marks"):

**[Intentionally Left Blank]**

| La Mer Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| LA MER | 1339888 | June 11, 1985 | IC 003- (Cosmetics- namely, skin crème & skin moisturizer) |
| LA MER | 2276149 | September 7, 1999 | IC 003- (Cosmetics, namely, skin care preparations, skin cleansing lotion, skin cleansing gel, skin tonic, skin moisturizing cream & lotion) |
|  | 3440482 | June 3, 2008 | IC 003- (Cosmetics; Non medicated skin care preparations) |
| LA MER | 3637492 | June 16, 2009 | IC 003- (Non- medicated skin care preparations; cosmetics; body & beauty care cosmetics); IC 035- (retail store services featuring personal care products, cosmetics, toiletries, bath & body products, skin care products, & beauty treatments; online retail store |

13

**COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

| La Mer Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| | | | services featuring personal care products, cosmetics, toiletries, bath & body products, skin care products, & beauty treatments); IC 044- (Beauty consultation in the field of selection & use of cosmetics, toiletries, bath & body products, skin care products, beauty treatments & personal appearance; skin care salons; providing information regarding the selection & use of cosmetics, toiletries, skin care products, bath & body products, beauty treatments & personal appearance; providing services relating to skin care, namely facials |
| CREME DE LA MER | 2751557 | August 19, 2003 | IC 003- (Cosmetics, namely, skin care preparations, skin moisturizing cream & lotion) |

32.     Attached hereto as **Exhibit C** are true and correct copies of the trademark registrations identified in paragraph 31 of this Complaint, which are incorporated herein by reference.

### 4.  The CLINIQUE® Brand

33.     Clinique Laboratories, LLC owns, manages, enforces, licenses and maintains the intellectual property, including trademarks and copyrights, used in

connection with the operation of the CLINIQUE® brand (hereinafter referred to as "Clinique"). Clinique brand was started in 1968 when a beauty editor collaborated with a leading dermatologist, inspired by the idea of creating great skin through a simple, effective routine. Clinique skincare products are dermatologist-developed, allergy-tested, and fragrance-free. Clinique also manufactures fragrances and cosmetics, including the wildly popular BLACK HONEY lipstick shade.

34.    Today, Clinique is one of the most popular skincare and cosmetics brands in the world, and has been endorsed by many A-list celebrities and is routinely mentioned in famous publications such as *Vogue, Harper's Bazaar*, and *Marie Claire*.

35.    Clinique products are the subject of significant media attention and are often singled out by fashion editors as being among the top skincare and makeup products, as well as being among the top skincare and beauty products.  For example, Clinique's BLACK HONEY products have received several awards, including the CEW "Iconic Beauty Award" and Allure Best of Beauty Award in 2023 and more recently, TODAY Beauty Award in 2024.  These awards highlight the enduring popularity and cult status of Clinique's products. Additionally, Clinique's breakthrough research showcasing the powerful efficacy of its CLINIQUE SMART serums recently served as the basis for a paper published in the Journal of Cosmetic Dermatology.  Clinique's DRAMATICALLY DIFFERENT MOISTURIZING LOTION+ is another best-selling product, with one being sold every 7.5 seconds globally. The worldwide recognition as a luxury brand and the overwhelming popularity of its products is due to Clinique's continuous commitment to quality and excellence.

36.    Today, Clinique products are sold in over 105 countries and in more than 2,000 locations in the United States. Clinique offers more than 500 different product SKUs under the CLINIQUE® house mark in the United States. ranging from medicated and non-medicated skincare to makeup, to fragrance, to sun and body care, to men's care. Additionally, there are more than 1,048 Clinique consultants working in the United States. Clinique also enjoys a strong social media presence and following, with

over 3.5M followers on Instagram alone. In the United States, Clinique products are sold nationwide through its website www.clinique.com, in addition to luxury department stores such as Saks Fifth Avenue and Nordstrom, and luxury beauty stores such as Sephora and Bluemercury, both online and at their brick and mortar locations.

37.    Clinique is the owner of numerous marks, including, in relevant part, the following U.S. federal trademark registrations (collectively, the "Clinique Marks"):

| Clinique Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| <br>C CLINIQUE & DESIGN | 6216106 | December 8, 2020 | IC 03: (Cosmetics; Non-medicated skin care preparations; Non-medicated toiletry preparations) |
| <br>C CLINIQUE | 4209127 | September 18, 2012 | IC 03: (Cosmetics; Non-medicated skin care preparations; Non-medicated sun care preparations) |
| <br>C DEVICE | 2178066 | August 4, 1998 | IC 03: (Cosmetic creams, lotions and oils, namely: skin cleansing creams, lotions, masks and oils; skin moisturizing lotions and creams; makeup, namely, face powder, foundation makeup bases; rouges, blushers, eye shadow; |

| Clinique Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| | | | makeup removers; skin exfoliating creams) |
| CLINIQUE | 1626589 | December 11, 1990 | IC 03: (Cosmetics - namely, cleansers, moisturizers, face tonics, face masks, face powder, foundation, blushers, mascara, eyeshadow, eyeliner, eyemakeup remover, lipstick, lip pencil, nail enamel, nail treatment, sun block, after sun balm, hair spray, deodorants) |
| CLINIQUE & C DEVICE | 0892987 | June 16, 1970 | IC (03: Cosmetic creams, lotions and oils - namely, cleansing creams, lotions and oils; moisturizing lotions and creams; make-up namely, face powder, foundation make-up bases; rouges; eye make-up preparations- namely, mascara, eye liner, eye shadow, eyebrow pencil) |

17

| Clinique Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
|  CLINIQUE GREEN | 4284957 | February 5, 2013 | IC 03: (Cosmetics; Non-medicated skin care preparations; Non-medicated sun care preparations). |
| CLINIQUE SMART | 4594306 | August 26, 2014 | IC 03: (Non-medicated skin care preparations). |
| SMART CLINICAL REPAIR W/CLINIQUE | 6660611 | March 1, 2022 | IC 03: (cosmetics and non-medicated skin care preparations) |
| SMART CLINICAL W/CLINIQUE | 5985339 | February 11, 2020 | IC 03: (cosmetics and non-medicated skin care preparations) |

38.    Attached hereto as **Exhibit D** are true and correct copies of the trademark registrations identified in paragraph 37 of this Complaint, which are incorporated herein by reference.

### 5.  The AVEDA® Brand

39.    Aveda Corporation owns, manages, enforces, licenses and maintains the intellectual property, including trademarks and copyrights, used in connection with the operation of the AVEDA® brand (hereinafter referred to as "Aveda"). Aveda is a leading high-performance, plant-based hair and skin care brand, trusted by millions of guests and thousands of artists and salons around the world. Aveda was created in 1978 after founder Horst Rechelbacher was introduced to the science of Ayurveda on a trip

to India. Aveda's first product was a clove shampoo that Rechelbacher formulated in his kitchen sink with help from Ayurvedic doctors. ELC acquired Aveda (or its predecessor in interest) in 1997.

40.     Today Aveda offers a wide range of haircare, skin and body care products, perfume, candles, and related beauty products and services used in over 8,000 trusted salons and spas worldwide. Through its Aveda Institutes, Aveda provides comprehensive beauty education and training, empowering students to achieve fulfilling careers in cosmetology while also promoting environmental responsibility and social well-being through plant-based, cruelty-free products and giving back to the community.

41.     Aveda is a certified B Corp, meaning that it meets high standards of environmental performance and transparency. Aveda is also Leaping Bunny certified, meaning that its products, raw ingredients, or components were not tested on animals during any stage of product development. In fact, all Aveda products have been cruelty-free since the brand's inception in 1978.

42.     Aveda places a strong emphasis on environmental responsibility. Since 1989, Aveda has been a signatory to the Ceres Principles, and it was the first beauty company to use 100% post-consumer recycled materials. Since 2021, all Aveda hair care, body care, makeup, and aroma products are 100% vegan.

43.     Aveda is recognized nationwide and across the world as a luxury brand and the overwhelming popularity of its products is due to Aveda's continuous commitment to quality, excellence, and environmental responsibility. Aveda's products are sold nationwide through its website www.aveda.com, in addition to luxury department stores such as Nordstrom, both online and at their brick-and-mortar locations, and in hair salons nationwide.

44.     Aveda is the owner of numerous marks, including, in relevant part, the following U.S. federal trademark registration (the "Aveda Mark"):

| Aveda Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| AVEDA | 3326598 | October 30, 2007 | IC 21: (Cosmetic brushes; hair brushes) |

45.    A true and correct copy of the trademark registration identified in paragraph 44 of this Complaint is attached hereto as **Exhibit E** and is fully incorporated herein by reference.

### 6. The TOM FORD® Brand and Private Blend Collection Trade Dress

46.    001 Del LLC owns, manages, enforces, licenses and maintains the intellectual property, including trademarks and copyrights, used in connection with the operation of the TOM FORD® brand (hereinafter referred to as "Tom Ford").  Tom Ford is a global luxury fashion house offering exceptional women's and men's fashion, accessories, eyewear, and beauty products. Tom Ford originally launched in 2005 with fragrance and eyewear, and today is known around the world for its refined elegance.

47. Tom Ford's first fragrance, Black Orchid, launched on November 2, 2006 at the Saks Fifth Avenue flagship store with many high-profile celebrities in attendance.

48. In 2007, Tom Ford launched the Private Blend fragrance collection, which now includes twenty-three fragrances. Lost Cherry, one of the Private Blend fragrances, won the *Allure* Best of Beauty Award in 2021. The Private Blend fragrance collection, markets and features the design elements protected under the "Private Blend Collection Trade Dress." The Private Blend Collection Trade Dress is unique and comprised of the following non-functional elements:

    a.  A rectangular-like bottle shape with defined corners;

    b.   A flared bottle neck with a flared lid;

    c.  A cap design with a flat square top that connects to a tapered column with concave sides (which forms the neck of the bottle);



**Commented [DM1]:** It is extremely important to us that we are consistent in defining our trade dress. One idea is to create a distinction between the overall *collection* of fragrances and the individual bottle shape.  As mentioned, we have applied for TM registration for the bottle-shape (which is facing obstacles).  In that application, we did *not* claim color as a feature, but we think it makes sense to include it here since the infringers are copying the color elements. Perhaps by defining this trade dress as the *collection* of fragrances, we can distinguish from the bottle itself and expand upon the features claimed? TBD.

**Commented [DM2]:** If helpful, we can narrow the description/claims from this application (the *original* drawing/description), although note that we been issued substantive refusals and have since narrowed the claims:

First description: The mark consists of a four sided perfume bottle design with a plaque affixed to the front face of the bottle and the cap with a flat top and concave sides.

Second description: The mark consists of a three-dimensional bottle cap design with a flat square top that connects to a tapered column with concave sides, which forms the neck of the bottle. The cap of the bottle connects to the base of the bottle about two-thirds of the way down the tapered column, as shown by the dotted line that appears there.

https://tsdr.uspto.gov/#caseNumber=98386681+&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch

**Commented [HJ3R2]:** Agree we need to be consistent in how we describe our trade dress

**Commented [VM4R2]:** Another office action has been issued w/r/t the trade dress, let's discuss this

**Commented [BB5R2]:** We're going to need to make sure that the definition of the trade dress here is different and more narrowly defined as the description in the office action

**Commented [DM6R2]:** Let's discuss how to best define the trade dress.

An alternative that exactly mirrors the TM app descriptions is below (but note that the a-b were dropped from the claimed design in responding to the first office action:

a.a four sided perfume bottle
b.a plaque affixed to the front face of the bottle
c.a cap design with a flat square top that connects to a tapered column with concave sides (which forms the neck of the bottle).

[...]

d. The cap of the bottle connects to the base of the bottle about two-thirds of the way down the tapered column;

e. A monochrome color scheme between the bottle, lid, and fragrance that evokes the scent of the fragrance;

f. A rectangular plaque, featuring the name of the fragrance in a capitalized block typeface.

g. Each of the Private Blend fragrances feature these unique and distinctive elements. Though the Private Blend fragrances all clearly embody the Private Blend Collection Trade Dress, they are readily distinguishable from each other, because an element of the Private Blend Collection Trade Dress is that each fragrance has its own distinctive color scheme that evokes the scent of the fragrance. For example:

   i. The "Rose Prick" fragrance is in a matte, soft pink bottle, with the Private Blend plaque in black, with white lettering;

   ii. The "Electric Cherry" fragrance itself is red, in a red-tinted glass bottle with red components (such as the atomizer). The Private Blend plaque is in a complimentary light pink, with cut out lettering;

   iii. The "Fucking Fabulous" fragrance is in a black matte bottle, and the Private Blend plaque is black with black lettering;

   iv. The "Tobacco Vanille" fragrance is in a dark brown glass bottle, with the Private Blend plaque in gold, and cut out lettering;

   v. The "Bitter Peach" fragrance itself is orange, in an orange-tinted glass bottle with orange components (such as the atomizer). The Private Blend plaque is in a complimentary lighter orange, with cut out lettering.

Commented [DM7]: Make this a consistent change whenever referencing.

COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

49.  The Private Blend Collection Trade Dress, which is a composite of the above-referenced features, is non-functional in its entirety, visually distinctive, and unique in the fragrance industry, examples of its distinctive appearance as a whole are shown in the photographs below:

    

50.  The design of the Private Blend Collection Trade Dress is neither essential to its use or purpose, nor does it affect the cost or quality of the fragrance. There are numerous other designs available that are equally feasible and efficient, none of which necessitate copying or imitating the Private Blend Collection Trade Dress. The combination of features comprising the Private Blend Collection Trade Dress provides no cost advantages to the manufacturer or utilitarian advantages to the consumer. These features, in combination, serve only to render the Private Blend fragrances, the embodiment of the Private Blend Collection Trade Dress, as a distinct product originating solely from Tom Ford.

51. The Private Blend fragrance line, the embodiment of the Private Blend Collection Trade Dress, is one of the most well-recognized and commercially successful fragrance lines, having been featured in many of Tom Ford's advertising and promotional materials as well as in various fashion and lifestyle publications. The Private Blend fragrances have received a large volume of unsolicited media attention.

52. The worldwide recognition as a luxury brand and the overwhelming

popularity of the Tom Ford brand and Private Blend fragrances is due to Tom Ford's continuous commitment to quality and excellence, and the significant time, effort, and money Tom Ford has spent in designing, developing, advertising, and promoting the TOM FORD® brand and fragrances embodying the Private Blend Collection Trade Dress.

53. Due to its long use, extensive sales, and significant advertising and promotional activities, the Private Blend Collection Trade Dress has achieved widespread acceptance and recognition among the consuming public and trade throughout the United States and the world. Accordingly, the Private Blend Collection Trade Dress has achieved a high degree of consumer recognition and secondary meaning, which serves to identify Tom Ford as the exclusive source of fragrances embodying said trade dress.

54. Tom Ford is also the owner of numerous marks, including, in relevant part, the following U.S. federal trademark registration (the "Tom Ford Mark"):

| Tom Ford Mark | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| TOM FORD | 3127260 | August 8, 2006 | IC 003- perfume, eau de parfum, eau de toilette and cologne |

55. A true and correct copy of the trademark registration identified in paragraph 54 of this Complaint is attached hereto as **Exhibit F** and is fully incorporated herein by reference.

56. Tom Ford fragrances, including the Private Blend collection fragrances, are sold nationwide through the website www.tomfordbeauty.com, in Tom Ford free-standing stores, and luxury department and beauty stores such as Saks Fifth Avenue, Nordstrom, and Sephora.

### 7.  The ELC Trademarks

1     57. The Estée Lauder, Le Labo, La Mer, Clinique, Aveda, and Tom Ford Marks

2  are collectively referred to herein as "the ELC Trademarks."

3     58. Plaintiffs have devoted substantial time, effort, and money to designing,

4  developing, advertising, promoting, and marketing their products, and spends millions

5  of dollars per year on advertising, promoting, and marketing the ESTÉE LAUDER ®,

6  LE LABO®, LA MER®, CLINIQUE®, AVEDA® and TOM FORD® brands.

7  Plaintiffs advertise throughout the world, from social media to select high-end and

8  artistic magazines.  As a result of these efforts, ELC's global net sales exceeded $14

9  billion in fiscal year 2025.

10     59. Registrations for the ELC Trademarks are valid, subsisting, and many are

11  incontestable.  Plaintiffs were able to obtain trademark registrations for the ELC

12  Trademarks without proof of secondary meaning and thus they are inherently

13  distinctive. Through longstanding use, advertising, and registration, the ELC

14  Trademarks have achieved a high degree of consumer recognition in the United States

15  and the world over and constitute famous marks.

16     60. Plaintiffs have continuously used the ELC Trademarks in interstate

17  commerce in connection with the sale, distribution, promotion, and advertising of their

18  goods. Accordingly, some of the ELC Trademarks have been used as a source identifier

19  on various goods for more than 40 years.

20     61. The ELC Trademarks have come to identify, in the United States and

21  throughout the world, high quality fragrances, beauty, and personal care products,

22  designed and manufactured by the Plaintiffs.  In turn, consumers have come to identify

23  the ELC Trademarks as being associated with and originating from the Plaintiffs.

24     62. Due to Plaintiffs' long use, extensive sales, and significant advertising and

25  promotional activities, the ELC Trademarks have achieved widespread acceptance and

26  recognition amongst the consuming public and trade throughout the United States.

27     63. Plaintiffs have achieved such fame as to be copied by others without

28  authorization, including Defendants, as is the case with many other luxury brands.

**Commented [DM8]:** I feel comfortable with these figures, we do much more.

**Commented [BB9]:** Paragraph 31 you identifiy the estee lauder marks.  Here you seem to include Tom Ford.  If you meant to include Ford, you should shift paragraph 31 to after the discussion of Tom Ford.

**B. Defendants' Infringing Conduct**

64. The present lawsuit arises from Defendants' manufacture, production, marketing, distribution, advertisement, offering for sale, and/or sale in the U.S. of certain skincare and fragrance products that bear marks that are identical with, substantially indistinguishable from, or confusingly similar to one or more of the ELC Trademarks and Private Blend Collection Trade Dress (the "Accused Products").

65. Upon information and belief, Defendants are engaged in the retail sale of various products, including skincare, cosmetics, and fragrances nationally and worldwide. Defendants' products reach consumers through its brick-and-mortar stores nationwide and via its website (www.walmart.com), including to consumers within this District.

66. Upon information and belief, Defendants promote, offer for sale, and sell products, including the Accused Products, through its e-commerce platform on www.walmart.com. Defendants published listings on Walmart.com using the ELC Trademarks in its search engine optimization tools to drive traffic to the Accused Products. Accordingly, Defendants displayed, promoted, and advertised the Accused Products for sale on www.walmart.com.

67. Plaintiffs are informed and believe, and thereon allege that a person shopping on Walmart.com would have reasonably believed that Walmart, and not third-party sellers, was the seller with title or possession of the Accused Product who could have entered into a contract to transfer title or possession.

68. Indeed, in Vans v. Walmart, Case No. 21-CV-01876-DOC, 2023 WL 6922833 (C.D. Cal. Oct. 11, 2023), the court held:

> "Here too, a reasonable consumer may believe that TT/DM's shoes sold on Walmart.com are sold by Walmart, not TT/DM. TT/DM's listings are on Walmart.com. PSUF # 105. TT/DM's listings were displayed right next to Walmart's wholesale shoes. Id. # 105. When customers purchased TT/DM shoes, they used the Walmart.com checkout system. Id. # 105. If a customer is

1   unsatisfied with TT/DM's shoes, they would submit a complaint through
2   Walmart.com, and Walmart would resolve the issue if TT/DM did not do so in a
3   timely fashion. Id. # 108. Although listings for products sold directly by Walmart
4   specify that the item is "sold and shipped by Walmart," DRPFD # 105, the record
5   does not indicate the size or prominence of that statement. Additionally, TT/DM's
6   listings on the Walmart website do not explicitly state that the order will be filled
7   a third party. Thus, a reasonable person may believe that Walmart, not TT/DM,
8   offered to sell TT/DM's allegedly infringing shoes listed on Walmart.com."

9       69. Plaintiffs are informed and believe that Walmart has not materially changed
10  its website since this ruling.

11      70. Upon information and belief, Defendants promote the reputation and
12  professionalism of retailers who – with Defendants' support and authorization – sell
13  through Defendants' e-commerce channel. Defendants' website states that they
14  "select[s]" and "partner[s]" with their Marketplace sellers, looking at the seller's
15  catalog, operations, and other business information to "ensure they can give the same
16  high-quality experiences to all our Walmart.com customers." Defendants also state that
17  they regularly review seller performance. Pursuant to Defendants' stated practices,
18  Defendants permitted and selected the sellers of the Accused Products to sell products
19  that infringe upon the ELC Trademarks.

20      71. Upon information and belief, when consumers purchase a product from the
21  Marketplace, aka Defendants' e-commerce channel on www.walmart.com, Defendants
22  are in control of the payment and checkout process, customer service issues, and handles
23  returns of a product purchased from the Marketplace, including permitting the consumer
24  to return the product to a Walmart store. Accordingly, a consumer using Defendants'
25  Marketplace and purchasing the Accused Products would reasonably believe that
26  Defendants were the seller of the Accused Products and/or had a contract with the third-
27  party seller of the Accused Products such that Walmart was authorized to sell the same.
28  Further, through Defendants' partnership with its sellers, including those who sold the

Accused Products, Defendants provide a level of involvement, support, promotion, advertising, warehousing, fulfillment, returns, and pricing that situates Defendants as the seller of the Accused Products, and the primary beneficiary of the infringement.

72. Upon information and belief, Defendants receive a portion of the profits generated from their partners' product listings on the Marketplace website and receive substantial profits from fulfillment fees that eCommerce sellers use on www.walmart.com.

73. Upon information and belief, Defendants do very little to ensure that only authorized and authentic products are available on www.walmart.com. This is readily apparent given the Accused Products were permitted to be sold on Defendants' website despite their stated careful selection process in who they choose as a Marketplace seller/partner. Accordingly, Defendants know or had reason to know that the sellers they partnered with and "regularly review[ed]" were selling products which infringe upon the Estée Lauder Marks, i.e., the Accused Products. Defendants know or had reason to know that Defendants promoted, advertised, displayed, offered for sale, and/or sold products which infringe upon the ELC Trademarks, including the Accused Products.

74. Upon information and belief, Defendants manufactured, distributed, offered for sale, sold, and shipped the Accused Products to consumers in this judicial district.

75. Plaintiffs have not granted a license or given Defendants any form of permission to use intellectual property belonging to Plaintiffs, including the ELC T trademarks and Private Blend Collection Trade Dress, in any way. Plaintiffs purchased some of the Accused Products and inspected and/or tested all of the Accused Products and confirmed the Accused Products did not originate from the Plaintiffs. Defendants used the ELC Trademarks on the Accused Products without Plaintiffs' permission.

**1. Defendant's Infringement of the Estée Lauder Marks**

76. Plaintiffs are informed, believe, and thereon allege that Defendant imported into the U.S., advertised, marketed, offered for sale, and/or sold at least the Accused Products identified below  (the "Estée Lauder Accused Products") through Walmart's website (www.walmart.com) to consumers nationwide, including consumers located within this judicial district. Exemplars of the Estée Lauder Accused Products below:



77. The Estée Lauder Accused Products are not genuine Estée Lauder products.

78. The Estée Lauder Accused Products that Defendants sold and shipped to various consumers within this District are very likely to cause confusion for consumers, including Plaintiffs' customers, who, at the time of initial interest, sale, and/or in the post-sale setting are led to believe that the Estée Lauder Accused Products are genuine goods originating from, associated with, and/or approved by Estée Lauder due to the marks being identical, substantially indistinguishable, or confusingly similar to the Estée Lauder Marks.

79. Upon information and belief, Defendants' unlawful acts have misled and confused, and were intended to cause confusion, or to cause mistake, or to deceive as

to the origin, affiliation, or association of the Estée Lauder Accused Products with Estée Lauder, and the sponsorship or approval of the Estée Lauder Accused Products by Estée Lauder.

**2. Defendant's Infringement of the Le Labo Marks**.

80. Plaintiffs are informed, believe, and thereon allege that Defendant imported into the U.S., advertised, marketed, offered for sale, and/or sold at least the Accused Products identified below  (the "Le Labo Accused Products") through Walmart's website (www.walmart.com) to consumers nationwide, including consumers located within this judicial district. Exemplars of the Le Labo Accused Products below:





81. The Le Labo Accused Products are not genuine Le Labo products.

82. The Le Labo Accused Products that Defendants sold and shipped to various consumers within this District are very likely to cause confusion for consumers,

1  including Plaintiffs' customers, who, at the time of initial interest, sale, and/or in the
2  post-sale setting are led to believe that the Le Labo Accused Products are genuine
3  goods originating from, associated with, and/or approved by Le Labo due to the marks
4  being identical, substantially indistinguishable, or confusingly similar to the Le Labo
5  Marks.
6      83. Upon information and belief, Defendants' unlawful acts have misled and
7  confused, and were intended to cause confusion, or to cause mistake, or to deceive as
8  to the origin, affiliation, or association of the Le Labo Accused Products with Le Labo,
9  and the sponsorship or approval of the Le Labo Accused Products by Le Labo.
10     **3. Defendant's Infringement of the La Mer Marks.**
11      84. Plaintiffs are informed, believe, and thereon allege that Defendant imported
12  into the U.S., advertised, marketed, offered for sale, and/or sold at least the Accused
13  Products identified below (the "La Mer Accused Products") through Walmart's website
14  ([www.walmart.com](www.walmart.com)) to consumers nationwide, including consumers located within this
15  judicial district. Exemplars of the La Mer Accused Products below:






85. The La Mer Accused Products are not genuine La Mer products.

86. The La Mer Accused Products that Defendants sold and shipped to various consumers within this District are very likely to cause confusion for consumers, including Plaintiffs' customers, who, at the time of initial interest, sale, and/or in the post-sale setting are led to believe that the La Mer Accused Products are genuine goods originating from, associated with, and/or approved by La Mer due to the marks being identical, substantially indistinguishable, or confusingly similar to the La Mer Marks.

87. Upon information and belief, Defendants' unlawful acts have misled and confused, and were intended to cause confusion, or to cause mistake, or to deceive as to the origin, affiliation, or association of the La Mer Accused Products with La Mer, and the sponsorship or approval of the La Mer Accused Products by La Mer.

**4. Defendant's Infringement of the Clinique Marks.**

88. Plaintiffs are informed, believe, and thereon allege that Defendant imported into the U.S., advertised, marketed, offered for sale, and/or sold at least the Accused Products identified below (the "Clinique Accused Products") through Walmart's website (www.walmart.com) to consumers nationwide, including consumers located within this judicial district. Exemplars of the Clinique Accused Products below:

 

Commented [VM10]: I don't know why but it won't let me move the photos around - will come back and trouble shoot this

89. The Clinique Accused Products are not genuine Clinique products.

90. The Clinique Accused Products that Defendants sold and shipped to various consumers within this District are very likely to cause confusion for consumers, including Plaintiffs' customers, who, at the time of initial interest, sale, and/or in the post-sale setting are led to believe that the Clinique Accused Products are genuine goods originating from, associated with, and/or approved by Clinique due to the marks being identical, substantially indistinguishable, or confusingly similar to the Clinique Marks.

91. Upon information and belief, Defendants' unlawful acts have misled and confused, and were intended to cause confusion, or to cause mistake, or to deceive as to the origin, affiliation, or association of the Clinique Accused Products with Clinique, and the sponsorship or approval of the Clinique Accused Products by Clinique.

**5. Defendant's Infringement of the AVEDA® Mark**

92. Plaintiffs are informed, believe, and thereon allege that Defendant imported into the U.S., advertised, marketed, offered for sale, and/or sold at least the Accused Products identified below (the "Aveda Accused Products") through Walmart's website (www.walmart.com) to consumers nationwide, including consumers located within this judicial district. Exemplars of the Aveda Accused Products below:



93. The Aveda Accused Products are not genuine Aveda products.

94. The Aveda Accused Products that Defendants sold and shipped to various consumers within this District are very likely to cause confusion for consumers, including Plaintiffs' customers, who, at the time of initial interest, sale, and/or in the post-sale setting are led to believe that the Aveda Accused Products are genuine goods originating from, associated with, and/or approved by Aveda due to the marks being identical, substantially indistinguishable, or confusingly similar to the Aveda Marks.

95. Upon information and belief, Defendants' unlawful acts have misled and confused, and were intended to cause confusion, or to cause mistake, or to deceive as to the origin, affiliation, or association of the Aveda Accused Products with Aveda, and the sponsorship or approval of the Aveda Accused Products by Aveda.

**6. Defendant's Infringement of the Tom Ford Mark**

96. Plaintiffs are informed, believe, and thereon allege that Defendant imported into the U.S., advertised, marketed, offered for sale, and/or sold at least the Accused Products identified below  (the "Tom Ford Accused Products") through Walmart's website (www.walmart.com) to consumers nationwide, including consumers located within this judicial district. Exemplars of the Tom Ford Accused Products below:

 

97. The Tom Ford Accused Products are not genuine Tom Ford products.

98. The Tom Ford Accused Products that Defendants sold and shipped to various consumers within this District are very likely to cause confusion for consumers, including Plaintiffs' customers, who, at the time of initial interest, sale, and/or in the post-sale setting are led to believe that the Tom Ford Accused Products are genuine goods originating from, associated with, and/or approved by Tom Ford due to the marks being identical, substantially indistinguishable, or confusingly similar to the Tom Ford Mark.

99. Upon information and belief, Defendants' unlawful acts have misled and confused, and were intended to cause confusion, or to cause mistake, or to deceive as to the origin, affiliation, or association of the Tom Ford Accused Products with Tom Ford, and the sponsorship or approval of the Tom Ford Accused Products by Tom Ford.

**7. Defendant's Infringement of the Private Blend Collection Trade Dress**

100. Plaintiffs are informed, believe, and thereon allege that Defendant imported into the U.S., advertised, marketed, offered for sale, and/or sold at least the Accused Products identified below (which are copycat versions of Tom Ford's "Rose Prick," "Electric Cherry," "Fucking Fabulous," "Tobacco Vanille," and "Bitter Peach" fragrances, including their distinctive color schemes - an element of the Private Blend Collection Trade Dress) (the "Private Blend Collection Accused Products") through Walmart's website (www.walmart.com) to consumers nationwide, including consumers located within this judicial district. Exemplars of the Private Blend Collection Accused Products, along with the corresponding Tom Ford Private Blend Fragrances below:

**[Intentionally Left Blank]**

| Private Blend Collection Accused Products | Tom Ford Products |
|---|---|
|  |  |

Commented [HJ11]: We should find images of our products that also feature the cartons to show both primary and secondary packaging is being copied.

Commented [DM12R11]: Working on this with Christine, need a few more.













1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



101.   The Private Blend Collection Accused Products that Defendants sold and shipped to various consumers within this District are very likely to cause confusion for consumers, including Plaintiffs' customers, who, at the time of initial interest, sale, and/or in the post-sale setting are led to believe that the Private Blend Collection

Accused Products are genuine goods originating from, associated with, and/or approved by Tom Ford due to the marks being identical, substantially indistinguishable, or confusingly similar to the Tom Ford Marks, including the Private Blend Collection Trade Dress.

102.   As evidenced by the comparisons above, Defendant has directly copied the Private Blend Collection Trade Dress. Such direct copying raises a strong inference that the Private Blend Collection Trade Dress has acquired secondary meaning.

103.   Plaintiffs are informed, believe, and thereon allege that Defendant is a competitor of Tom Ford and Defendant introduced the Private Blend Collection Accused Products into the stream of commerce to exploit Tom Ford's goodwill and the reputation of Tom Ford's Private Blend fragrances.

104.   Upon information and belief, Defendants' unlawful acts have misled and confused, and were intended to cause confusion, or to cause mistake, or to deceive as to the origin, affiliation, or association of the Private Blend Collection Accused Products with Tom Ford, and the sponsorship or approval of the Private Blend Collection Accused Products by Tom Ford.

105.   With regard to all of the foregoing Accused Products, Plaintiffs are informed and believe and thereon alleges that Defendant is a competitor of Plaintiffs' and Defendant introduced the Accused Products into the stream of commerce in an effort to exploit Plaintiffs' goodwill and the reputation of Plaintiffs' trademarks and the Private Blend Collection Trade Dress. Furthermore, Plaintiffs allege that that the Accused Products are deliberate copies of Plaintiffs' goods created to confuse consumers into believing that the Accused Products were authentic  products, or otherwise manufactured, offered, sponsored, authorized, licensed by or otherwise connected with Plaintiffs or come from the same source as Plaintiffs' goods when they in fact do not.

**FIRST CAUSE OF ACTION**

**(Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114**

**-Estée Lauder Marks)**

106.   Plaintiffs incorporate by reference each and every one of the preceding paragraphs as though fully set forth herein.

107.   This is an action for trademark infringement and/or counterfeiting against Defendants under 15 U.S.C. § 1114 based on their use of counterfeit and confusingly similar imitations of the Estée Lauder Marks in commerce in connection with Defendants' promotion, distribution, manufacturing, offer for sale, sale, marketing, and/or advertising of the Estée Lauder Accused Products.

108.   The Estée Lauder Marks are nationally recognized, including within the Central District of California, as being affixed to goods and merchandise of the highest quality, with Estée Lauder being the exclusive source of all such products.

109.   The specific U.S. registrations to the Estée Lauder Marks identified herein are in full force and effect, and each one has been in continuous use since their respective first dates of use.   Indeed, three of the U.S. registrations identified in paragraph 20, namely Reg. Nos. 3217192, 3126881, and 6166738 are incontestable by virtue of their registrations and continuous use in commerce for more than five years.

110.   The Estée Lauder Accused Products bear counterfeit marks that are identical or substantially indistinguishable to the Estée Lauder Marks based on how the marks appear in the marketplace to a consumer. The marks on the Estée Lauder Accused Products are spurious because Estée Lauder has examined the marks and confirmed they are inauthentic.   Due to the identical or substantially indistinguishable appearance of the marks compared to the Estée Lauder Marks, consumers are likely to be confused, mistaken, or deceived, as to the origin of the marks on the Estée Lauder Accused Products.

111.   The Estée Lauder Accused Products bear marks that are confusingly similar to the Estée Lauder Marks based on how the marks appear in the marketplace to

a consumer such that it is likely to cause confusion, mistake, or deception as to the origin of the marks on the Estée Lauder Accused Products.

112.   The identical or substantially indistinguishable or confusingly similar marks on the Estée Lauder Accused Products are likely to lead to and result in consumers believing that Estée Lauder produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Estée Lauder.

113.   Defendants' promotion, marketing, advertising, offering for sale, selling, manufacturing, and/or distribution of the Estée Lauder Accused Products and marks within is without Estée Lauder' permission or authority and in total disregard of Estée Lauder' rights to control its intellectual property.

114.   Upon information and belief, Defendants' acts are deliberate and intended to confuse the public as to the source of Defendants' goods or services and to injure Estée Lauder and reap the benefit of Estée Lauder' goodwill associated with the Estée Lauder Marks.

115.   As a direct and proximate result of Defendants' infringing conduct, Estée Lauder has been injured and will continue to suffer injury to its business and reputation unless Defendants are enjoined by this Court from advertising, selling, and offering for sale products bearing the Estée Lauder Marks that are not in fact authentic Estée Lauder® products.

116.   Estée Lauder has no adequate remedy at law.

117.   In light of the foregoing, Estée Lauder is entitled to injunctive relief prohibiting Defendants from using any of the Estée Lauder Marks, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that Estée Lauder has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees

1   and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-

2   (b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

3                          **SECOND CAUSE OF ACTION**

4        **(Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114**

5                                **-Le Labo Marks)**

6        118.   Plaintiffs incorporate by reference each and every one of the preceding

7   paragraphs as though fully set forth herein.

8        119.   This is an action for trademark infringement and/or counterfeiting against

9   Defendants under 15 U.S.C. § 1114 based on their use of counterfeit and confusingly

10  similar imitations of the Le Labo Marks in commerce in connection with Defendants'

11  promotion, distribution, manufacturing, offer for sale, sale, marketing, and/or

12  advertising of the Le Labo Accused Products.

13       120.   The Le Labo Marks are nationally recognized, including within the Central

14  District of California, as being affixed to goods and merchandise of the highest quality,

15  with Le Labo being the exclusive source of all such products.

16       121.   The specific U.S. registrations to the Le Labo Marks identified herein are

17  in full force and effect, and each one has been in continuous use since their respective

18  first dates of use.  Indeed, two of the U.S. registrations identified in paragraph 26,

19  namely Reg. Nos. 4659715 and 4659463 are incontestable by virtue of their

20  registrations and continuous use in commerce for more than five years.

21       122.   The Le Labo Accused Products bear counterfeit marks that are identical or

22  substantially indistinguishable to the Le Labo Marks based on how the marks appear in

23  the marketplace to a consumer.  The marks on the Le Labo Accused Products are

24  spurious because Le Labo has examined the marks and confirmed they are inauthentic.

25  Due to the identical or substantially indistinguishable appearance of the marks

26  compared to the Le Labo Marks, consumers are likely to be confused, mistaken, or

27  deceived, as to the origin of the marks on the Le Labo Accused Products.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

123.   The Le Labo Accused Products bear marks that are confusingly similar to the Le Labo Marks based on how the marks appear in the marketplace to a consumer such that it is likely to cause confusion, mistake, or deception as to the origin of the marks on the Le Labo Accused Products.

124.   The identical or substantially indistinguishable or confusingly similar marks on the Le Labo Accused Products are likely to lead to and result in consumers believing that Le Labo produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Le Labo.

125.   Defendants' promotion, marketing, advertising, offering for sale, selling, manufacturing, and/or distribution of the Le Labo Accused Products and marks within is without Le Labo's permission or authority and in total disregard of Le Labo's rights to control its intellectual property.

126.   Upon information and belief, Defendants' acts are deliberate and intended to confuse the public as to the source of Defendants' goods or services and to injure Le Labo and reap the benefit of Le Labo' goodwill associated with the Le Labo Marks.

127.   As a direct and proximate result of Defendants' infringing conduct, Le Labo has been injured and will continue to suffer injury to its business and reputation unless Defendants are enjoined by this Court from advertising, selling, and offering for sale products bearing the Le Labo Marks that are not in fact authentic Le Labo products.

128.   Le Labo has no adequate remedy at law.

129.   In light of the foregoing, Le Labo is entitled to injunctive relief prohibiting Defendants from using any of the Le Labo Marks, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that Le Labo has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble

1  damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or

2  statutory damages pursuant to 15 U.S.C § 1117(c).

3  **THIRD CAUSE OF ACTION**

4  **(Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114**

5  **-La Mer Marks)**

6  130.   Plaintiffs incorporate by reference each and every one of the preceding

7  paragraphs as though fully set forth herein.

8  131.   This is an action for trademark infringement and/or counterfeiting against

9  Defendants under 15 U.S.C. § 1114 based on their use of counterfeit and confusingly

10  similar imitations of the La Mer Marks in commerce, in connection with Defendants'

11  promotion, distribution, manufacturing, offer for sale, sale, marketing, and/or

12  advertising of the La Mer Accused Products.

13  132.   The La Mer Marks are nationally recognized, including within the Central

14  District of California, as being affixed to goods and merchandise of the highest quality,

15  with La Mer being the exclusive source of all such products.

16  133.   The specific U.S. registrations to the La Mer Marks identified herein are

17  in full force and effect, and each one has been in continuous use since their respective

18  first dates of use.   Indeed, the U.S. registrations identified in paragraph 31 are

19  incontestable by virtue of their registrations and continuous use in commerce for more

20  than five years.

21  134.   The La Mer Accused Products bear counterfeit marks that are identical or

22  substantially indistinguishable to the La Mer Marks based on how the marks appear in

23  the marketplace to a consumer.   The marks on the La Mer Accused Products are

24  spurious because La Mer has examined the marks and confirmed they are inauthentic.

25  Due to the identical or substantially indistinguishable appearance of the marks

26  compared to the La Mer Marks, consumers are likely to be confused, mistaken, or

27  deceived, as to the origin of the marks on the La Mer Accused Products.

28

135.   The La Mer Accused Products bear marks that are confusingly similar to the La Mer Marks based on how the marks appear in the marketplace to a consumer such that it is likely to cause confusion, mistake, or deception as to the origin of the marks on the La Mer Accused Products.

136.   The identical or substantially indistinguishable or confusingly similar marks on the La Mer Accused Products are likely to lead to and result in consumers believing that La Mer produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of La Mer.

137.   Defendants' promotion, marketing, advertising, offering for sale, selling, manufacturing, and/or distribution of the La Mer Accused Products and marks within is without La Mer' permission or authority and in total disregard of La Mer' rights to control its intellectual property.

138.   Upon information and belief, Defendants' acts are deliberate and intended to confuse the public as to the source of Defendants' goods or services and to injure La Mer and reap the benefit of La Mer' goodwill associated with the La Mer Marks.

139.   As a direct and proximate result of Defendants' infringing conduct, La Mer has been injured and will continue to suffer injury to its business and reputation unless Defendants are enjoined by this Court from advertising, selling, and offering for sale products bearing the La Mer Marks that are not in fact authentic LA MER® products.

140.   La Mer has no adequate remedy at law.

141.   In light of the foregoing, La Mer is entitled to injunctive relief prohibiting Defendants from using any of the La Mer Marks, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that La Mer has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble

damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

## FOURTH CAUSE OF ACTION

### (Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114
### -Clinique Marks)

142.    Plaintiffs incorporate by reference each and every one of the preceding paragraphs as though fully set forth herein.

143.    This is an action for trademark infringement and/or counterfeiting against Defendants under 15 U.S.C. § 1114 based on their use of counterfeit and confusingly similar imitations of the Clinique Marks in commerce, in connection with Defendants' promotion, distribution, manufacturing, offer for sale, sale, marketing, and/or advertising of the Clinique Accused Products.

144.    The Clinique Marks are nationally recognized, including within the Central District of California, as being affixed to goods and merchandise of the highest quality, with Clinique being the exclusive source of all such products.

145.    The specific U.S. registrations to the Clinique Marks identified herein are in full force and effect, and each one has been in continuous use since their respective first dates of use.  Indeed, seven of the U.S. registrations identified in paragraph 37, namely Reg. Nos. 4209127, 2178066, 1626589, 0892987, 4284957, 4594306, and 5985339 are incontestable by virtue of their registrations and continuous use in commerce for more than five years.

146.    The Clinique Accused Products bear counterfeit marks that are identical or substantially indistinguishable to the Clinique Marks based on how the marks appear in the marketplace to a consumer.  The marks on the Clinique Accused Products are spurious because Clinique has examined the marks and confirmed they are inauthentic.  Due to the identical or substantially indistinguishable appearance of the marks compared to the Clinique Marks, consumers are likely to be confused, mistaken, or deceived, as to the origin of the marks on the Clinique Accused Products.

147.   The Clinique Accused Products bear marks that are confusingly similar to the Clinique Marks based on how the marks appear in the marketplace to a consumer such that it is likely to cause confusion, mistake, or deception as to the origin of the marks on the Clinique Accused Products.

148.   The identical or substantially indistinguishable or confusingly similar marks on the Clinique Accused Products are likely to lead to and result in consumers believing that Clinique produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Clinique.

149.   Defendants' promotion, marketing, advertising, offering for sale, selling, manufacturing, and/or distribution of the Clinique Accused Products and marks within is without Clinique's permission or authority and in total disregard of Clinique's rights to control its intellectual property.

150.   Upon information and belief, Defendants' acts are deliberate and intended to confuse the public as to the source of Defendants' goods or services and to injure Clinique and reap the benefit of Clinique's goodwill associated with the Clinique Marks.

151.   As a direct and proximate result of Defendants' infringing conduct, Clinique has been injured and will continue to suffer injury to its business and reputation unless Defendants are enjoined by this Court from advertising, selling, and offering for sale products bearing the Clinique Marks that are not in fact authentic Clinique® products.

152.   Clinique has no adequate remedy at law.

153.   In light of the foregoing, Clinique is entitled to injunctive relief prohibiting Defendants from using any of the Clinique Marks, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that Clinique has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained

1    by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble

2    damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or

3    statutory damages pursuant to 15 U.S.C § 1117(c).

4                          **FIFTH CAUSE OF ACTION**

5        **(Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114**

6                              **-Aveda Mark)**

7        154.   Plaintiffs incorporate by reference each and every one of the preceding

8    paragraphs as though fully set forth herein.

9        155.   This is an action for trademark infringement and/or counterfeiting against

10   Defendants under 15 U.S.C. § 1114 based on their use of counterfeit and confusingly

11   similar imitations of the Aveda Mark in commerce, in connection with Defendants'

12   promotion, distribution, manufacturing, offer for sale, sale, marketing, and/or

13   advertising of the Aveda Accused Products.

14       156.   The Aveda Mark is nationally recognized, including within the Central

15   District of California, as being affixed to goods and merchandise of the highest quality,

16   with Aveda being the exclusive source of all such products.

17       157.   The specific U.S. registration to the Aveda Mark identified in paragraph

18   44 is in full force and effect, and has been in continuous use since its first date of use.

19   Indeed, the Aveda Mark is incontestable by virtue of its registration and continuous use

20   in commerce for more than five years.

21       158.   The Aveda Accused Products bear counterfeit marks that are identical or

22   substantially indistinguishable to the Aveda Mark based on how the marks appear in

23   the marketplace to a consumer.  The marks on the Aveda Accused Products are spurious

24   because Aveda has examined the marks and confirmed they are inauthentic.  Due to the

25   identical or substantially indistinguishable appearance of the marks compared to the

26   Aveda Mark, consumers are likely to be confused, mistaken, or deceived, as to the

27   origin of the marks on the Aveda Accused Products.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

159.   The Aveda Accused Products bear marks that are confusingly similar to the Aveda Mark based on how the marks appear in the marketplace to a consumer such that it is likely to cause confusion, mistake, or deception as to the origin of the marks on the Aveda Accused Products.

160.   The identical or substantially indistinguishable or confusingly similar marks on the Aveda Accused Products are likely to lead to and result in consumers believing that Aveda produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Aveda.

161.   Defendants' promotion, marketing, advertising, offering for sale, selling, manufacturing, and/or distribution of the Aveda Accused Products and marks within is without Aveda' permission or authority and in total disregard of Aveda' rights to control its intellectual property.

162.   Upon information and belief, Defendants' acts are deliberate and intended to confuse the public as to the source of Defendants' goods or services and to injure Aveda and reap the benefit of Aveda' goodwill associated with the Aveda Mark.

163.   As a direct and proximate result of Defendants' infringing conduct, Aveda has been injured and will continue to suffer injury to its business and reputation unless Defendants are enjoined by this Court from advertising, selling, and offering for sale products bearing the Aveda Mark that are not in fact authentic AVEDA® products.

164.   Aveda has no adequate remedy at law.

165.   In light of the foregoing, Aveda is entitled to injunctive relief prohibiting Defendants from using any of the Aveda Mark, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that Aveda has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble damages, as well

1  as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or statutory damages

2  pursuant to 15 U.S.C § 1117(c).

3  ## SIXTH CAUSE OF ACTION

4  **(Trademark Infringement Under the Lanham Act, 15 U.S.C. § 1114**

5  **-Tom Ford Mark)**

6  166.    Plaintiffs incorporate by reference each and every one of the preceding

7  paragraphs as though fully set forth herein.

8  167.    This is an action for trademark infringement and/or counterfeiting against

9  Defendants under 15 U.S.C. § 1114 based on their use of counterfeit and confusingly

10  similar imitations of the Tom Ford Mark in commerce, in connection with Defendants'

11  promotion, distribution, manufacturing, offer for sale, sale, marketing, and/or

12  advertising of the Tom Ford Accused Products.

13  168.    The Tom Ford Mark is nationally recognized, including within the Central

14  District of California, as being affixed to goods and merchandise of the highest quality,

15  with Tom Ford being the exclusive source of all such products.

16  169.    The specific U.S. registration to the Tom Ford Mark identified in

17  paragraph 54 is in full force and effect, and has been in continuous use since its first

18  date of use.  Indeed, the Tom Ford Mark is incontestable by virtue of its registration and

19  continuous use in commerce for more than five years.

20  170.    The Tom Ford Accused Products bear counterfeit marks that are identical

21  or substantially indistinguishable to the Tom Ford Mark based on how the marks appear

22  in the marketplace to a consumer.  The marks on the Tom Ford Accused Products are

23  spurious because Tom Ford has examined the marks and confirmed they are inauthentic.

24  Due to the identical or substantially indistinguishable appearance of the marks

25  compared to the Tom Ford Mark, consumers are likely to be confused, mistaken, or

26  deceived, as to the origin of the marks on the Tom Ford Accused Products.

27  171.    The Tom Ford Accused Products bear marks that are confusingly similar

28  to the Tom Ford Mark based on how the marks appear in the marketplace to a consumer

such that it is likely to cause confusion, mistake, or deception as to the origin of the marks on the Tom Ford Accused Products.

172.   The identical or substantially indistinguishable or confusingly similar marks on the Tom Ford Accused Products are likely to lead to and result in consumers believing that Tom Ford produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Tom Ford.

173.   Defendants' promotion, marketing, advertising, offering for sale, selling, manufacturing, and/or distribution of the Tom Ford Accused Products and marks within is without Tom Ford' permission or authority and in total disregard of Tom Ford' rights to control its intellectual property.

174.   Upon information and belief, Defendants' acts are deliberate and intended to confuse the public as to the source of Defendants' goods or services and to injure Tom Ford and reap the benefit of Tom Ford' goodwill associated with the Tom Ford Mark.

175.   As a direct and proximate result of Defendants' infringing conduct, Tom Ford has been injured and will continue to suffer injury to its business and reputation unless Defendants are enjoined by this Court from advertising, selling, and offering for sale products bearing the Tom Ford Mark that are not in fact authentic TOM FORD® products.

176.   Tom Ford has no adequate remedy at law.

177.   In light of the foregoing, Tom Ford is entitled to injunctive relief prohibiting Defendants from using any of the Tom Ford Mark, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that Tom Ford has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees

1    and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-

2    (b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

3

4                          **SEVENTH CAUSE OF ACTION**

5    **(False Designation of Origin and False Descriptions – 15 U.S.C. § 1125(a)**

6                          **-Estée Lauder Marks)**

7          178.  Estée Lauder incorporates by reference each and every one of the

8    preceding paragraphs as though fully set forth herein.

9          179.  Defendants' unauthorized use of marks identical or substantially

10   indistinguishable or confusingly similar to the Estée Lauder Marks on its merchandise,

11   in interstate commerce and advertising relating to same, constitutes false designation of

12   origin and a false representation that the goods are manufactured, offered, sponsored,

13   authorized, licensed by or otherwise connected with Estée Lauder or come from the

14   same source as Estée Lauder' goods when they in fact do not.

15         180.  Defendants' use of the Estée Lauder Marks is without Estée Lauder's

16   permission or authority and in total disregard of Estée Lauder's rights to control its

17   trademarks.

18         181.  Defendants' activities are likely to lead to and result in confusion, mistake

19   or deception, and are likely to cause the public to believe that Estée Lauder has

20   produced, sponsored, authorized, licensed or is otherwise connected or affiliated with

21   Defendants' commercial and business activities, all to the detriment of Estée Lauder.

22         182.  Estée Lauder has no adequate remedy at law.

23         183.  In light of the foregoing, Estée Lauder is entitled to injunctive relief

24   prohibiting Defendants from using any of the Estée Lauder Marks, and/or any marks

25   identical, substantially indistinguishable, or confusingly similar thereto, and to recover

26   from Defendants all damages, including attorneys' fees, that Estée Lauder has sustained

27   and will sustain as a result of such infringing acts, and all gains, profits and advantages

28   obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees

1    and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-

2    (b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

3                              **EIGHTH CAUSE OF ACTION**

4        **(False Designation of Origin and False Descriptions – 15 U.S.C. § 1125(a)**

5                                    **-Le Labo Marks)**

6        184.  Le Labo incorporates by reference each and every one of the preceding

7    paragraphs as though fully set forth herein.

8        185.  Defendants' unauthorized use of marks identical or substantially

9    indistinguishable or confusingly similar to the Le Labo Marks on its merchandise, in

10   interstate commerce and advertising relating to same, constitutes false designation of

11   origin and a false representation that the goods are manufactured, offered, sponsored,

12   authorized, licensed by or otherwise connected with Le Labo or come from the same

13   source as Le Labo' goods when they in fact do not.

14       186.  Defendants' use of the Le Labo Marks is without Le Labo's permission or

15   authority and in total disregard of Le Labo's rights to control its trademarks.

16       187.  Defendants' activities are likely to lead to and result in confusion, mistake

17   or deception, and are likely to cause the public to believe that Le Labo has produced,

18   sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants'

19   commercial and business activities, all to the detriment of Le Labo.

20       188.  Le Labo has no adequate remedy at law.

21       189.  In light of the foregoing, Le Labo is entitled to injunctive relief prohibiting

22   Defendants from using any of the Le Labo Marks, and/or any marks identical,

23   substantially indistinguishable, or confusingly similar thereto, and to recover from

24   Defendants all damages, including attorneys' fees, that Le Labo has sustained and will

25   sustain as a result of such infringing acts, and all gains, profits and advantages obtained

26   by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble

27   damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or

28   statutory damages pursuant to 15 U.S.C § 1117(c).

## NINTH CAUSE OF ACTION

**(False Designation of Origin and False Descriptions – 15 U.S.C. § 1125(a)**

**-La Mer Marks)**

190.   La Mer incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

191.   Defendants' unauthorized use of marks identical or substantially indistinguishable or confusingly similar to the La Mer Marks on its merchandise, in interstate commerce and advertising relating to same, constitutes false designation of origin and a false representation that the goods are manufactured, offered, sponsored, authorized, licensed by or otherwise connected with La Mer or come from the same source as La Mer' goods when they in fact do not.

192.   Defendants' use of the La Mer Marks is without La Mer's permission or authority and in total disregard of La Mer's rights to control its trademarks.

193.   Defendants' activities are likely to lead to and result in confusion, mistake or deception, and are likely to cause the public to believe that La Mer has produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of La Mer.

194.   La Mer has no adequate remedy at law.

195.   In light of the foregoing, La Mer is entitled to injunctive relief prohibiting Defendants from using any of the La Mer Marks, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that La Mer has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

## TENTH CAUSE OF ACTION

**(False Designation of Origin and False Descriptions – 15 U.S.C. § 1125(a)**

**-Clinique Marks)**

196. Clinique incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

197. Defendants' unauthorized use of marks identical or substantially indistinguishable or confusingly similar to the Clinique Marks on its merchandise, in interstate commerce and advertising relating to same, constitutes false designation of origin and a false representation that the goods are manufactured, offered, sponsored, authorized, licensed by or otherwise connected with Clinique or come from the same source as Clinique' goods when they in fact do not.

198. Defendants' use of the Clinique Marks is without Clinique's permission or authority and in total disregard of Clinique's rights to control its trademarks.

199. Defendants' activities are likely to lead to and result in confusion, mistake or deception, and are likely to cause the public to believe that Clinique has produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Clinique.

200. Clinique has no adequate remedy at law.

201. In light of the foregoing, Clinique is entitled to injunctive relief prohibiting Defendants from using any of the Clinique Marks, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that Clinique has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

<u>**ELEVENTH CAUSE OF ACTION**</u>

**(False Designation of Origin and False Descriptions – 15 U.S.C. § 1125(a)**

**-Aveda Mark)**

202.   Aveda incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

203.   Defendants' unauthorized use of marks identical or substantially indistinguishable or confusingly similar to the Aveda Mark on its merchandise, in interstate commerce and advertising relating to same, constitutes false designation of origin and a false representation that the goods are manufactured, offered, sponsored, authorized, licensed by or otherwise connected with Aveda or come from the same source as Aveda' goods when they in fact do not.

204.   Defendants' use of the Aveda Mark is without Aveda's permission or authority and in total disregard of Aveda's rights to control its trademarks.

205.   Defendants' activities are likely to lead to and result in confusion, mistake or deception, and are likely to cause the public to believe that Aveda has produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Aveda.

206.   Aveda has no adequate remedy at law.

207.   In light of the foregoing, Aveda is entitled to injunctive relief prohibiting Defendants from using any of the Aveda Mark, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that Aveda has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

## TWELFTH CAUSE OF ACTION

### (False Designation of Origin and False Descriptions – 15 U.S.C. § 1125(a) -Tom Ford Mark)

208.   Tom Ford incorporates by reference each and every one of the preceding paragraphs as though fully set forth herein.

209. Defendants' unauthorized use of marks identical or substantially indistinguishable or confusingly similar to the Tom Ford Mark on its merchandise, in interstate commerce and advertising relating to same, constitutes false designation of origin and a false representation that the goods are manufactured, offered, sponsored, authorized, licensed by or otherwise connected with Tom Ford or come from the same source as Tom Ford' goods when they in fact do not.

210. Defendants' use of the Tom Ford Mark is without Tom Ford's permission or authority and in total disregard of Tom Ford's rights to control its trademarks.

211. Defendants' activities are likely to lead to and result in confusion, mistake or deception, and are likely to cause the public to believe that Tom Ford has produced, sponsored, authorized, licensed or is otherwise connected or affiliated with Defendants' commercial and business activities, all to the detriment of Tom Ford.

212. Tom Ford has no adequate remedy at law.

213. In light of the foregoing, Tom Ford is entitled to injunctive relief prohibiting Defendants from using any of the Tom Ford Mark, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover from Defendants all damages, including attorneys' fees, that Tom Ford has sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

## THIRTEENTH CAUSE OF ACTION

**(Trade Dress Infringement of the "Private Blend Collection Trade Dress" – 15 U.S.C. §1125(a))**

214. Plaintiffs incorporate by reference each and every one of the preceding paragraphs as if fully set forth therein.

215. In 2007, Tom Ford launched the Private Blend fragrance collection, which now includes twenty-three fragrances. Lost Cherry, one of the Private Blend fragrances,

won the *Allure* Best of Beauty Award in 2021. The Private Blend fragrance collection, markets and features the design elements protected under the "Private Blend Collection Trade Dress." The Private Blend Collection Trade Dress is unique and comprised of the following non-functional elements:

    a. A rectangular-like bottle shape with defined corners;

    b. A flared bottle neck with a flared lid;

    c. A cap design with a flat square top that connects to a tapered column with concave sides (which forms the neck of the bottle);

    d. The cap of the bottle connects to the base of the bottle about two-thirds of the way down the tapered column;

    e. A monochrome color scheme between the bottle, lid, and fragrance that evokes the scent of the fragrance;

    f. A rectangular plaque, featuring the name of the fragrance in a capitalized block typeface.

    g. Each of the Private Blend fragrances feature these unique and distinctive elements. Though the Private Blend fragrances all clearly embody the Private Blend Collection Trade Dress, they are readily distinguishable from each other, because an element of the Private Blend Collection Trade Dress is that each fragrance has its own distinctive color scheme that evokes the scent of the fragrance. For example:

        i. The "Rose Prick" fragrance is in a matte, soft pink bottle, with the Private Blend plaque in black, with white lettering;

        ii. The "Electric Cherry" fragrance itself is red, in a red-tinted glass bottle with red components (such as the atomizer). The Private Blend plaque is in a complimentary light pink, with cut out lettering;

        iii. The "Fucking Fabulous" fragrance is in a black matte bottle,

<div style="float:right; width:30%; font-size:smaller; color:gray;">

**Commented [DM13]:** It is extremely important to us that we are consistent in defining our trade dress. One idea is to create a distinction between the overall *collection* of fragrances and the individual bottle shape. As mentioned, we have applied for TM registration for the bottle-shape (which is facing obstacles). In that application, we did *not* claim color as a feature, but we think it makes sense to include it here since the infringers are copying the color elements. Perhaps by defining this trade dress as the *collection* of fragrances, we can distinguish from the bottle itself and expand upon the features claimed? TBD.

**Commented [DM14]:** If helpful, we can reference the description/claims from this application (the *original* drawing/description), although note that we have been issued substantive refusals and have since narrowed the claims:

First description: <mark>The mark consists of a four sided perfume bottle design with a plaque affixed to the front face of the bottle and the cap with a flat top and concave sides.</mark>

Second description: <mark>The mark consists of a three-dimensional bottle cap design with a flat square top that connects to a tapered column with concave sides which forms the neck of the bottle. The cap of the bottle connects to the base of the bottle about two-thirds of the way down the tapered column, as shown by the dotted line that appears there.</mark>

https://tsdr.uspto.gov/#caseNumber=98386681+&caseSearchType=US_APPLICATION&caseType=DEFAULT&searchType=statusSearch

**Commented [HJ15R14]:** Agree we need to be consistent in how we describe our trade dress

**Commented [VM16R14]:** Another office action has been issued w/r/t the trade dress, let's discuss this

**Commented [BB17R14]:** We're going to need to make sure that the definition of the trade dress here is different and more narrowly defined as the description in the office action

**Commented [DM18R14]: Let's discuss how to best define the trade dress.**

An alternative that exactly mirrors the TM app descriptions is below (but note that the a-b were dropped from the claimed design in responding to the first office action:

   c.*a four sided perfume bottle*
   f.*a plaque affixed to the front face of the bottle*

**Commented [DM19]:** Make this a consistent change whenever referencing.



</div>

and the Private Blend plaque is black with black lettering;

iv. The "Tobacco Vanille" fragrance is in a dark brown glass bottle, with the Private Blend plaque in gold, and cut out lettering;

v. The "Bitter Peach" fragrance itself is orange, in an orange-tinted glass bottle with orange components (such as the atomizer). The Private Blend plaque is in a complimentary lighter orange, with cut out lettering.

216.   The Private Blend Collection Trade Dress, which is a composite of the above-referenced features, is non-functional in its entirety, visually distinctive, and unique in the fragrance industry, examples of its distinctive appearance as a whole are shown in the photographs below:



217.   The design of the Private Blend Collection Trade Dress is neither essential to its use or purpose, nor does it affect the cost or quality of the fragrance. There are numerous other designs available that are equally feasible and efficient, none of which necessitate copying or imitating the Private Blend Collection Trade Dress. The combination of features comprising the Private Blend Collection Trade Dress provides no cost advantages to the manufacturer or utilitarian advantages to the consumer. These features, in combination, serve only to render the Private Blend fragrances, the

embodiment of the Private Blend Collection Trade Dress, as a distinct product originating solely from Tom Ford.

218.   The Private Blend fragrance line, the embodiment of the Private Blend Collection Trade Dress, is one of the most well-recognized and commercially successful fragrance lines, having been featured in many of Tom Ford's advertising and promotional materials as well as in various fashion and lifestyle publications. The Private Blend fragrances have received a large volume of unsolicited media attention.

219.   The worldwide recognition as a luxury brand and the overwhelming popularity of the Tom Ford brand and Private Blend fragrances is due to Tom Ford's continuous commitment to quality and excellence, and the significant time, effort, and money Tom Ford has spent in designing, developing, advertising, and promoting the TOM FORD® brand and fragrances embodying the Private Blend Collection Trade Dress.

220.   Due to its long use, extensive sales, and significant advertising and promotional activities, the Private Blend Collection Trade Dress has achieved widespread acceptance and recognition among the consuming public and trade throughout the United States and the world. Accordingly, the Private Blend Collection Trade Dress has achieved a high degree of consumer recognition and secondary meaning, which serves to identify Tom Ford as the exclusive source of fragrances embodying said trade dress.

221.   Upon information and belief, Defendant is a competitor of Tom Ford and Defendant introduced the Tom Ford Accused Products into the stream of commerce in an effort to exploit Tom Ford's goodwill and the reputation of the Private Blend Fragrances. Furthermore, Plaintiff alleges that that the Accused Products are deliberate copies of Plaintiffs' goods created to confuse consumers into believing that Accused Products were authentic TOM FORD® products, or otherwise manufactured, offered, sponsored, authorized, licensed by or otherwise connected with Tom Ford or come from the same source as Tom Ford' goods when they in fact do not.

222.   The Tom Ford Accused Products manufactured, imported, distributed, advertised, offered for sale, and/or sold by Defendant bear confusingly similar reproductions of the Private Blend Collection Trade Dress, such as to cause a likelihood of confusion as to the source, sponsorship, or approval of the Tom Ford Accused Products by Tom Ford.

223.   Defendant's use of the Private Blend Collection Trade Dress is without Plaintiffs' permission or authorization, and in total disregard of Plaintiffs' rights to control its intellectual property. There are numerous other designs and names in the fragrance industry, yet Defendants chose to copy the Private Blend Collection Trade Dress and include names similar to Plaintiffs' products in a willful attempt to deceive consumers.

224.   Defendant directly copied the Private Blend Collection Trade Dress. Such direct copying raises a strong inference that the Private Blend Collection Trade Dress has acquired secondary meaning.

225.   Defendant's use of the Private Blend Collection Trade Dress is likely to lead to and result in confusion, mistake, or deception, and is likely to cause the public to believe that the Tom Ford Accused Products are produced, sponsored, authorized, or licensed by or are otherwise connected or affiliated with Tom Ford.

226.   As a direct and proximate result of the foregoing acts, Tom Ford has suffered and will continue to suffer significant injuries in an amount to be determined at trial. Tom Ford is entitled to recover all damages, including attorneys' fees, that it has sustained and will sustain, and all gains, profits, and advantages obtained by Defendant as a result of its infringing acts.

227.   Furthermore, unless Defendant's unlawful acts are enjoined by this Court, there is no adequate remedy at law that can fully compensate Tom Ford for the harm caused by Defendant's infringement, which is ongoing. Accordingly, Tom Ford is entitled to injunctive relief prohibiting Defendant from continuing to infringe the Private Blend Collection Trade Dress, or any designs confusingly similar thereto.

**FOURTEENTH CAUSE OF ACTION**

**(Common Law Trademark Infringement and Unfair Competition**

**- All Accused Products)**

228.   Plaintiffs incorporate by reference each and every one of the preceding paragraphs as though fully set forth herein.

229.   Plaintiffs own and enjoy common law trademark rights to the ELC Trademarks in California and throughout the United States.  Tom Ford owns and enjoys common law trade dress rights to the Private Blend Collection Trade Dress.

230.   Defendants' misappropriation of Plaintiffs' common law trademarks and Tom Ford's Private Blend Collection Trade Dress was intended to capitalize on Plaintiffs' goodwill for Defendant's own pecuniary gain. Plaintiffs have expended substantial time, resources and effort to obtain an excellent reputation for themselves and their respective trademarks and trade dress. As a result of Plaintiffs' efforts, Defendants are now unjustly enriched and are benefiting from property rights that rightfully belong to Plaintiffs.

231.   Defendants' unauthorized use of the ELC Trademarks and the Private Blend Collection Trade Dress has caused and is likely to cause confusion as to the source of Defendant's products due to the marks appearing identical, substantially indistinguishable, or confusingly similar to the ELC Trademarks and the Private Blend Collection Trade Dress, all to the detriment of Plaintiffs.

232.   Defendants' acts are willful, deliberate, and intended to confuse the public and to injure Plaintiffs.

233.   Defendants' acts constitute unfair competition under California common law.

234.   Plaintiffs have no adequate remedy at law to compensate them fully for the damages that have been caused and which will continue to be caused by Defendants' infringing conduct unless it is enjoined by this Court.

235.  The conduct herein complained of was extreme, outrageous, fraudulent, and was inflicted on Plaintiffs in reckless disregard of Plaintiffs' rights. Said conduct was despicable and harmful to Plaintiffs and as such supports an award of exemplary and punitive damages in an amount sufficient to punish and make an example of Defendants and to deter them from similar such conduct in the future.

236.  In light of the foregoing, Plaintiffs are entitled to injunctive relief prohibiting Defendants from using the ELC Trademarks and the Private Blend Collection Trade Dress, to recover all damages, including attorneys' fees, that Plaintiffs have sustained and will sustain and all gains, profits and advantages obtained by Defendants as a result of their infringing acts alleged above in an amount not yet known, and the costs of this action.

## FIFTEENTH CAUSE OF ACTION

### (Vicarious Trademark Infringement)

237.  Plaintiffs incorporate by reference each and every one of the preceding paragraphs as though fully set forth herein.

238.  Defendants and the third parties who upload the Accused Products on Defendants' website are in an apparent or actual partnership, have the authority to bind one another in transactions with third parties, and/or exercise joint ownership or control over the infringing products. Defendants are thus vicariously liable for the trademark infringement and counterfeiting of the third parties who sell the Accused Products through Defendants' Marketplace.

239.  Due to Defendants' acts of vicarious trademark infringement, Plaintiff has suffered damages in an amount to be established at trial.

240.  Due to Defendants' acts of vicarious trademark infringement, Plaintiff and other sellers on its site have obtained profits they would have not realized but for Defendants' contributory infringement. As such, Plaintiffs are entitled to injunctive relief prohibiting Defendants from using any of the ELC Trademarks, and/or any marks identical, substantially indistinguishable, or confusingly similar thereto, and to recover

from Defendants all damages, including attorneys' fees, that Plaintiffs have sustained and will sustain as a result of such infringing acts, and all gains, profits and advantages obtained by Defendants as a result thereof, in an amount not yet known, attorneys' fees and treble damages, as well as the costs of this action pursuant to 15 U.S.C. § 1117(a)-(b), and/or statutory damages pursuant to 15 U.S.C § 1117(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court enter judgment in their favor and against Defendants as follows:

1. Entry of an ORDER granting temporary, preliminary and permanent injunctive relief restraining and enjoining Defendants, their officers, agents, employees, and attorneys, and all those persons or entities in active concert or participation with them from:

    a. manufacturing, importing, advertising, marketing, promoting, supplying, distributing, offering for sale, or selling Accused Products and/or any other products that bear the ELC Trademarks, or any other marks identical, substantially indistinguishable, or confusingly similar thereto;

    b. engaging in any other activity constituting unfair competition with Plaintiffs, or acts and practices that deceive consumers, the public, and/or trade, including without limitation, the use of designations and design elements associated with Plaintiffs;

    c. committing any other act which falsely represents or which has the effect of falsely representing that the goods and services of Defendants are licensed by, authorized by, offered by, produced by, sponsored by, or in any other way associated with Plaintiffs;

2. Entry of an ORDER directing Defendants to recall from any distributors and retailers and to destroy all remaining inventory of the Accused Products, in

addition to any other goods that infringe upon Plaintiffs' rights to the ELC Trademarks, including all advertisements, promotional and marketing materials therefore, as well as means of making same in their possession or under their control;

3.   Entry of an ORDER directing Defendants to disclose their supplier(s) and manufacturer(s) of the Accused Products and provide all documents, correspondence, receipts, and invoices associated with the purchase of the Accused Products;

4.   Entry of an ORDER directing Defendants to file with this Court and serve on Plaintiffs within thirty (30) days after entry of the injunction a report in writing, under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

5.   Entry of an ORDER for an accounting by Defendants of all gains, profits, and/or advantages derived from their infringing acts pursuant to 15 U.S.C. § 1117(a);

6.   Awarding treble damages in the amount of Defendants' profits or Plaintiffs' damages, whichever is greater, for willful infringement pursuant to 15 U.S.C. § 1117(b);

7.   Awarding Plaintiffs statutory damages pursuant to 15 U.S.C. §1117(c);

8.   An award of enhanced damages due to Defendants' willful infringement;

9.   An award of applicable interest amounts, costs, disbursements, and/or attorneys' fees, as an exceptional case under 15 U.S.C. § 1117 or otherwise;

10. An award of fees and punitive damages to the full extent available in connection with Plaintiffs' claims under California law; and

11. Any such other relief that may be just and proper.

Dated:  February 9, 2026                BLAKELY LAW GROUP


                               By:    */s/ Victoria E. Mulvey*
                                      Brent H. Blakely
                                      Victoria E. Mulvey
                                      ***Attorneys for Plaintiffs***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs Estée Lauder, Inc; Le Labo Holding LLC; La Mer Technology, Inc.; Clinique Laboratories, LLC; Aveda Corporation; and 001 Del LLC d/b/a Tom Ford hereby demand a trial by jury as to all claims in this litigation.

Dated:      February 9, 2026          BLAKELY LAW GROUP


By:   */s/ Victoria E. Mulvey*
      Brent H. Blakely
      Victoria E. Mulvey
      ***Attorneys for Plaintiffs***
      ***Estée Lauder, Inc; Le Labo Holding
      LLC; La Mer Technology, Inc.; Clinique
      Laboratories, LLC; Aveda Corporation;
      and 001 Del LLC d/b/a Tom Ford***